662 A.2d 509

CIRCLE CHEVROLET COMPANY, A NEW JERSEY CORPORATION, AND THOMAS J. DEFELICE, SR., PLAINTIFFS–APPELLANTS, v. GIORDANO, HALLERAN & CIESLA, A PROFESSIONAL CORPORATION, DEFENDANT–THIRD–PARTY PLAINTIFF–RESPONDENT, v. PETRICS, MESKIN, NASSAUR & DAMBACH, ACCOUNTS AND AUDITORS, THIRD–PARTY DEFENDANT–RESPONDENT.

Argued March 28, 1995—Decided August 1, 1995.

282

*Ronald L. Lueddeke* argued the cause for appellants.

*Richard L. Friedman* argued the cause for respondent Giordano, Halleran & Ciesla, etc. (*Giordano, Halleran & Ciesla,* attorneys; *Mr. Friedman,* of counsel; *Mr. Friedman, Lawrence J. Sharon,* and *Jodi L. Rosenberg,* on the briefs).

*Christopher J. Carey* argued the cause for respondent Petrics, Meskin, Nassaur & Dambach, etc. (*Tompkins, McGuire & Wachenfeld,* attorneys; *Mr. Carey,* of counsel; *Michael S. Miller* and *Mary Anne McConeghy,* on the briefs).

The opinion of the Court was delivered by

HANDLER, Justice.

This case involves the scope of the entire controversy doctrine as it applies to joinder of parties. At issue in this case, as well as, *Mystic Isle Development Corp. v. Perskie & Nehmad,* 142 *N.J.*

310, 662 *A.*2d 523, is whether the entire controversy doctrine applies to a malpractice action against an attorney who represents a client in the underlying transaction.

The case is before us as a result of a dissent in the Appellate Division. *R.* 2:2–1(a)(2). On appeal, the Appellate Division ruled, in a reported opinion, 274 *N.J.Super.* 405, 644 *A.*2d 626 (1994), that the entire controversy doctrine applied and, accordingly, dismissed the action.

## I

Plaintiff Circle Chevrolet Co. (Circle) is a privately-owned corporation that operates a car dealership in Shrewsbury, New Jersey. 274 *N.J.Super.* at 409, 644 *A.*2d 626. Thomas J. DeFelice, Sr. (DeFelice) is the president and sole shareholder of Circle. *Ibid.* The dealership is located on land owned by Masward II, a partnership consisting of DeFelice, his brother Edward DeFelice, and Albert North, each of whom own a one-third interest. *Ibid.*

In 1972, Circle entered into a thirty-year lease with Masward II for rental of the property. The lease, drafted by John Giordano of Giordano, Halleran & Ciesla, P.C. (GH & C), includes four additional option periods at the conclusion of the thirty-year term. *Ibid.* Pursuant to the lease, base rent for the land was $24,000 per year for the first ten years. *Ibid.* The lease contains a clause that provides for rent increases in the eleventh, sixteenth and twenty-first years after commencement of the lease, as well as upon the initiation of any five-year renewal period. *Ibid.* The lease provides for rent increases based on a percentage of increases in the Consumer Price Index (CPI).[1]

---

[1] The formula for computing the increase is provided in the lease as follows:
The percentage increases, if any, in the level of the official CONSUMER UNITED STATES DEPARTMENT OF LABOR INDEX [ (C.P.I.) ] as published for the quarterly period of the year immediately prior to the commencement of the rent adjustment period (i.e. commencement of the eleventh, sixteenth, twenty-first year of the original lease term and commencement of each five (5) year renewal term) over the level of such index as published for

In March 1985, Circle and Masward II began discussions regarding the first rent increase. At the time of these discussions, Masward II was represented by the law firm of Gaughran & Steib (Gaughran), while Circle was represented by defendant GH & C. *Id.* at 409–10, 644 *A.*2d 626. The dispute was finally settled by Circle agreeing to pay the increased rent based on a formula devised by Gaughran, which calculated the rent increase based upon the actual increase in the CPI from February 1973 to February 1983. *Id.* at 410, 644 *A.*2d 626. On March 22, 1985, Gaughran sent a letter containing the amount of the rent increases to Circle's attorney, Thomas Pliskin, a partner at GH & C. Pliskin then forwarded the letter to Thomas DeFelice of Circle, asking him to review the letter and advise GH & C as to his desired course of action. DeFelice asked his accountants, Petrics, Meskin, Nassaur & Dambach (Petrics) to review the formula. Petrics found that the calculations were accurate, assuming that the CPI numbers were correct. Circle's lawyers, GH & C, did not question the accountants' review, and the formula was incorporated into the settlement agreement. *Ibid.*

Unfortunately, the Gaughran formula was wrong. It calculated the rent increase based upon *actual* increases in the CPI. The lease, however, explicitly states that increases would be based upon *percentage* increases in the CPI. *Id.* at 409, 644 *A.*2d 626. It was not until February 24, 1988, on receipt of notice from Gaughran that another increase was about to take effect, that Pliskin reviewed Gaughran's calculations and discovered that an error had been made. As a result, Circle overpaid its rent by $37,699.98. Pliskin informed Gaughran of the error by letters dated March 9, 1988 and March 11, 1988. *Ibid.* Circle was also informed of the mistake at that time. *Ibid.*

In April 1988, GH & C filed a declaratory action against Masward II on behalf of Circle to reform the 1985 settlement

---

the quarterly period covering the commencement date of the original term of the lease.

agreement to reflect the correct rental increase calculation (hereinafter, the "reformation litigation"). *Ibid.* The reformation remedy was premised on the theory that a mutual mistake of fact had been made. *Ibid.* While that litigation was pending, Masward II also filed a suit against Thomas DeFelice in his individual capacity. That suit was consolidated with the reformation litigation.

In November 1988, during the course of the reformation litigation, GH & C withdrew as counsel for Circle because of a conflict of interest. *Id.* at 410–11, 644 *A.*2d 626. The law firm of Blaustein & Wasserman (Wasserman) took over representation of Circle on January 1989, after an initial meeting between Alan Wasserman and Circle. *Id.* at 411, 644 *A.*2d 626. Circle and Wasserman differ on the advice that Wasserman offered his client. Circle contends that Wasserman never informed it of any possible claims against GH & C and the accounting firm of Petrics while the reformation litigation was pending. *Ibid.* Circle states that it was advised of the existence of a claim against GH & C only after the reformation litigation had ended. *Ibid.* Wasserman, on the other hand, claims that not only did he inform Circle of "some culpability" on the part of GH & C and the existence of a "viable case against Petrics," but also that he notified Circle that the firm would not represent Circle if Circle decided to join GH & C as a defendant because GH & C had referred the case to Wasserman. *Ibid.* Wasserman also claims that in response to that information, Thomas DeFelice indicated that he had no intention of suing Petrics because of his close relationship with the accounting firm and that he did not want to sue GH & C. *Ibid.* GH & C and Petrics were not joined as defendants in the reformation litigation. *Ibid.* However, Circle did call them as witnesses in the action. *Ibid.*

The reformation litigation was eventually tried. *Ibid.* In August 1990, the trial court found that the Gaughran calculations were incorrect as a matter of law, and were not the result of a mutual mistake of fact. *Ibid.* The litigation ultimately ended in a settlement that was memorialized in an order of judgment, filed on

December 14, 1990. In the settlement agreement, signed by the court, the court found that there had been an overpayment of rent in the amount of $37,699.98. The settlement provided Circle with a $37,699.98 credit in its lease payments to Masward II. Thus, the court calculated that Circle did not need to pay rent for 4.6 months, commencing on September 1, 1990. From January 1, 1991 onward, Circle's monthly rental payments would be $5,420.

Subsequently, on September 6, 1991, Circle commenced a malpractice action against GH & C. Circle alleged that GH & C had negligently reviewed the rental-increase calculations, resulting in overpayment of rent by Circle and payment of unnecessary legal fees and costs. *Ibid.* GH & C then filed a third-party complaint against Petrics, and Circle subsequently amended its complaint to include Petrics as a named party-defendant.

On April 2, 1993, the trial court granted defendant's motion for summary judgment to dismiss Circle's claim, finding that Circle's action was barred by the entire controversy doctrine. *Id.* at 412, 644 *A*.2d 626. The trial court also dismissed GH & C's third-party complaint against Petrics with prejudice. Circle appealed.

A divided Appellate Division affirmed. Writing for the majority, Judge Keefe noted that New Jersey courts had applied the discovery rule to legal malpractice actions. *Id.* at 413, 644 *A*.2d 626. He held that Circle's cause of action against GH & C, as well as Petrics, accrued in March 1988 when Circle had knowledge of the mistake in the rent calculations. *Id.* at 415, 644 *A*.2d 626.

With respect to the entire controversy doctrine, Judge Keefe found that the doctrine barred a malpractice claim because the original action, the reformation litigation, was "premised on the mutual mistake of all parties, and a necessary element of that theme was GH & C's concession that it had been mistaken in its interpretation of the lease." *Id.* at 417, 644 *A*.2d 626. Thus, a malpractice claim could "easily have been presented in the settlement reformation suit as an alternative form of recovery in the event that the 'mutual' mistake theory was rejected." *Ibid.* Judge Stern dissented. He believed that legal malpractice actions

should be treated differently under the entire controversy doctrine, and that the "totality of the circumstances here does not require rigid adherence to the entire controversy doctrine to bar the present claims against defendants.... " *Id.* at 422, 644 *A.*2d 626.

Circle appealed. Although Circle failed to file a timely appellant's brief on its appeal as of right, this Court vacated its order dismissing the appeal for lack of prosecution and on January 11, 1995, reinstated its appeal.

We now affirm the majority determination and hold that the entire controversy doctrine applies to a client's legal malpractice claims against his or her attorney, even when the attorney is currently representing the client in an underlying action.

## II

The entire controversy doctrine seeks to further the judicial goals of fairness and efficiency by requiring, whenever possible, "that the adjudication of a legal controversy should occur in one litigation in only one court." *Cogdell v. Hospital Ctr.,* 116 *N.J.* 7, 15, 560 *A.*2d 1169 (1989). "The point of course, is that a component of the controversy may not be unfairly withheld, and a withholding is by definition unfair if its effect is to render the pending litigation merely one inning of the whole ball game." *Wm. Blanchard Co. v. Beach Concrete Co.,* 150 *N.J.Super.* 277, 294, 375 *A.*2d 675 (App.Div.) (citation omitted), *certif. denied,* 75 *N.J.* 528, 384 *A.*2d 507 (1977). The rule has been extended to include all affirmative claims that a party might have against another party, including counterclaims and cross-claims, *Ajamian v. Schlanger,* 14 *N.J.* 483, 487–89, 103 *A.*2d 9, *cert. denied,* 348 *U.S.* 835, 75 *S.Ct.* 58, 99 *L.Ed.* 659 (1954), as well as joinder of all parties with a material interest in the controversy, *i.e.,* those who can affect or be affected by the judicial outcome of the controversy. *Cogdell, supra,* 116 *N.J.* at 23, 26, 560 *A.*2d 1169; *R.* 4:30A. In *DiTrolio v. Antiles,* 142 *N.J.* 253, 267, 662 *A.*2d 494 (1995), we reiterated the objectives behind the doctrine: "(1) the need for

complete and final disposition through the avoidance of piecemeal decisions; (2) fairness to parties to the action and those with a material interest in the action; and (3) efficiency and the avoidance of waste and the reduction of delay." (citing *Cogdell, supra,* 116 *N.J.* at 15, 560 *A.*2d 1169). Application of the rule, however, is discretionary and clarification of the limits of the doctrine is best left to case-by-case determination. *Cogdell, supra,* 116 *N.J.* at 27–28, 560 *A.*2d 1169; *see DiTrolio, supra,* 142 *N.J.* at 275, 662 *A.*2d 494. For example, the rule should not be applied when "joinder would result in significant unfairness [to the litigants] or jeopardy to a clear presentation of the issues and just result." *Cogdell,* 116 *N.J.* at 27, 560 *A.*2d 1169; (quoting *Crispin v. Volkswagenwerk, A.G.,* 96 *N.J.* 336, 354–55, 476 *A.*2d 250 (1984) (Handler, J., concurring)). A trial court, however, can establish a particular litigation regime, such as staying the collateral action, in order to avoid any administrative unmanageability that may be caused by joining parties or issues. *Id.* at 27–28, 560 *A.*2d 1169; *see DiTrolio, supra,* 142 *N.J.* at 275, 662 *A.*2d 494.

The entire controversy doctrine applies to constituent claims that arise during the pendency of the first action that were known to the litigant. *DiTrolio, supra,* 142 *N.J.* at 274–275, 662 *A.*2d 494; *Brown v. Brown,* 208 *N.J.Super.* 372, 382, 506 *A.*2d 29 (App.Div.1986); *see also Busch v. Biggs,* 264 *N.J.Super.* 385, 398–99, 624 *A.*2d 1017 (App.Div.1993) (determining that entire controversy doctrine barred property owners' subsequent litigation against township engineer for alleged negligent acts preventing plaintiffs from obtaining approval of their subdivision application when plaintiffs knew of negligence but failed to join engineer in their original suit against township planning board); *Bendar v. Rosen,* 247 *N.J.Super.* 219, 237, 588 *A.*2d 1264 (App.Div.1991) (determining that entire controversy doctrine and judicial economy militate in favor of requiring assertion of cross-claim for contribution in underlying tort action, even though "technically a

right of contribution does not arise until a tortfeasor has paid more than his pro rata share").

Plaintiffs in this case and in *Mystic Isle, supra,* urge the Court to make an exception for legal malpractice claims that involve an attorney's negligent conduct in the controversy that is the subject of the original action. While we recognize that a client's claim against his or her attorney for malpractice engenders concerns inherent in the attorney-client relationship, those concerns may properly be addressed and accommodated under the principles of the entire controversy doctrine.

 The major complication stemming from the attorney-client relationship that can affect a malpractice claim relates to the accrual of the cause of action and the capacity of the client to recognize and respond to such a cause of action when it arises. We recognize that, for purposes of the statute of limitations, a cause of action against an attorney accrues when a client discovers he or she has been injured by that attorney's mistake, even if the full implications and damages of that error have not yet been ascertained. *See Grunwald v. Bronkesh,* 131 *N.J.* 483, 494, 621 *A.*2d 459 (1993). Thus, the limitations period can begin to run notwithstanding the fact that the errant attorney is currently representing the client on the underlying matter. A cause of action's point of accrual is equally relevant to the entire controversy doctrine. *Cafferata v. Peyser,* 251 *N.J.Super.* 256, 260, 597 *A.*2d 1101 (App.Div.1991). Thus, a client is under a double onus to bring the claim not only within the statute of limitations, but also within the boundaries set by the entire controversy doctrine. The fact that the attorney is one party responsible for a client's injury neither tolls the limitation period nor obviates the prohibition against piecemeal litigation.

 An attorney has an ethical obligation to advise a client that he or she might have a claim against that attorney, even if such advice flies in the face of that attorney's own interests. The *Rules of Professional Conduct (RPC)* provide that "[a] lawyer shall not represent a client if the representation of that client may

be materially limited by the ... lawyer's own interests, unless ... the client consents after a full disclosure of the circumstances and consultation with the client." *RPC* 1.7(b)(2). The *RPC* also provides that "[a] lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." *RPC* 1.4(b). Thus, an attorney who realizes he or she has made a mistake must immediately notify the client of the mistake as well as the client's right to obtain new counsel and sue the attorney for negligence. Accordingly, application of the entire controversy doctrine to legal malpractice claims does not infiltrate the sanctity of the lawyer-client relationship because, notwithstanding the doctrine, the attorney is under an overriding ethical obligation to inform the client of the accrual of a probable claim against that attorney.

■ Plaintiff claims that by requiring a client to assert its malpractice claim in the pending lawsuit, the client waives the attorney-client privilege, and leaves the lawyer open to interrogation concerning otherwise-privileged communications involving the very subject matter of the dispute. Indeed, both the ethics rules and the Rules of Evidence permit an attorney to reveal confidences in order to establish a defense to a legal malpractice claim by the client. *See RPC* 1.6(c)(2) (permitting attorney to reveal client confidences "to establish a defense to a ... civil claim ... against the lawyer based upon the conduct in which the client was involved"); *N.J.R.E.* 504(2)(c) (stating that the lawyer-client privilege shall not extend "to a communication relevant to an issue of breach of duty by the lawyer to his client, or by the client to his lawyer"); *N.J.S.A.* 2A:84A–20(2)(c) (same). Thus, clients will be faced with the Hobson's choice of having to choose between suing the former attorney simultaneously with the pending claim, thereby risking the exposure of previously-privileged information, or completely forfeiting his or her right to sue the former attorney in the hope that the underlying litigation is advantageous.

While we acknowledge potential for such a dilemma exists in certain circumstances, the risks of prejudice to the plaintiff are

minimized by other considerations. Once a malpractice action is commenced, the lawyer is not free to divulge all confidences. Rather, a lawyer sued for malpractice is obliged to "make every effort practicable to avoid unnecessary disclosure of information relating to a representation, to limit disclosure to those having the need to know it, and to obtain protective orders or make other arrangements minimizing the risk of disclosure." *Model Rules of Professional Responsibility* Rule 1.6(c) cmt. 18; *see RPC* 1.6(c) (information may be revealed "to the extent" necessary). Moreover, defendants are prohibited from taking advantage of the privilege waiver by alleging cross-claims against the plaintiff by the requirement that the defendant provide a sufficient showing of an objective factual basis for the claim.

Further, the entire controversy doctrine does not require that the malpractice claim be actually litigated with the underlying action; it merely requires that a party notify the court of the existence of material parties. *See Brown, supra,* 208 *N.J.Super.* at 382, 506 *A.*2d 29 ("a party whose constituent claim arises during the pendency of the action risks its loss unless he apprises the court and his adversary of its existence and submits to judicial discretion the determination of whether it should be joined in that action or reserved"). Moreover, the trial court is vested with the authority and responsibility to devise a litigation plan that is efficient and fair to all parties. *DiTrolio, supra,* 142 *N.J.* at 275, 662 *A.*2d 494; *see Baureis v. Summit Trust Co.,* 280 *N.J.Super.* 154, 163, 654 *A.*2d 1017 (App.Div.1995) ("[o]ur courts are vested with the judgment and discretion to recognize unrelated claims against non-parties which do not need to be joined"); *Brown, supra,* 208 *N.J.Super.* at 381–82, 506 *A.*2d 29. Thus, a trial court will consider the effects of joinder with respect to the preservation of attorney-client confidentialities when dealing with case management. Further, various procedural tools are available to the trial court to prevent excessively complicated or unfair litigation: case management and pretrial conferences, *R.* 4:25; stipulations of parties as to matters of fact, *R.* 4:25–7; the use of special verdicts, *R.* 4:39–1, to help the jury sort out the issues; and the require-

ment that attorneys obtain protective non-joinder orders. *R.* 4:30. In addition, the court has the power, under *Rule* 4:38–2(a), to sever claims "for the convenience of the parties or to avoid prejudice." The "[trial] court, rather than a litigant acting unilaterally, must make the determination of whether the supplementary claim is to be joined or reserved." *Brown, supra,* 208 *N.J.Super.* at 381, 506 *A.*2d 29. A party who does not allow the trial court to determine where the interests of substantial justice lay risks losing his or her right later to bring that claim. *See DiTrolio, supra,* 142 *N.J.* at 275, 662 *A.*2d 494.

The entire controversy doctrine balances the objectives of efficiency and fairness. Exempting legal malpractice claims would not further either of these objectives. First, efficiency is not achieved because the legal malpractice claim likely will involve the same "bundle of rights" that the underlying litigation sought to resolve. Therefore, it will necessarily result in a re-run of the original litigation. Second, fairness is not achieved because possibly relevant evidence and parties will be excluded from participating in the underlying and subsequent malpractice actions. Without the legal malpractice claim and its necessary parties, the original action will not be a comprehensive and complete determination of liability. The defendants included in the first suit may unjustly be made to bear the burden of accepting full responsibility and the brunt of total liability, just as the subsequent group of defendants are likely to appear wholly at fault before their jury.

### III

The bounds of the entire controversy doctrine, however, are not unlimited. *See Cogdell, supra,* 116 *N.J.* at 27–28, 560 *A.*2d 1169. The doctrine does not apply to bar component claims that are unknown, unarisen, or unaccrued at the time of the original action. *R.* 4:30A; *DiTrolio, supra,* 142 *N.J.* at 274–275, 662 *A.*2d 494; *Cafferata, supra,* 251 *N.J.Super.* at 260, 597 *A.*2d 1101 ("it is well settled that [the entire controversy doctrine] does not bar

transactionally related claims of which a party was unaware during the pendency of the prior litigation").

In *Grunwald, supra,* this Court held that the accrual of a legal malpractice claim is governed by the discovery rule. The Court concluded that legal malpractice claims fall within the special "class of cases" for which the discovery rule was adopted because "[i]n the context of legal counseling, a plaintiff may reasonably be unaware of the underlying factual basis for a cause of action." 131 *N.J.* at 493, 621 *A.*2d 459. Noting that "[t]he discovery rule is a rule of equity that ameliorates the 'often harsh and unjust results [that] flow from a rigid and automatic adherence to a strict rule of law,'" *id.* at 492, 621 *A.*2d 459 (quoting *Lopez v. Swyer,* 62 *N.J.* 267, 273–74, 300 *A.*2d 563 (1973)), the Court stressed that the discovery rule focuses on " 'an injured party's knowledge concerning the origin and existence of his injuries as related to the conduct of another person.'" *Ibid.* (quoting *Lynch v. Rubacky,* 85 *N.J.* 65, 70, 424 *A.*2d 1169 (1981)).

> Thus, the discovery rule encompasses two types of plaintiffs: those who do not become aware of their injury until the statute of limitations has expired, and those who are aware of their injury but do not know that it may be attributable to the fault of another.
>
> [*Ibid.* (quoting *Burd v. New Jersey Tel. Co.,* 76 *N.J.* 284, 291–92, 386 *A.*2d 1310 (1978).]

Accordingly, the Court reasoned that because an "inability readily to detect the necessary facts underlying a malpractice claim is a result of the special nature of the relationship between the attorney and client," applying the discovery rule to malpractice actions would "remove [an attorney's] [ ] incentive to deceive and thus ... preserve the fiduciary duty of full disclosure." *Id.* at 493–94, 621 *A.*2d 459. The Court held that "the statute of limitations begins to run only when the client suffers actual damage and discovers, or through the use of reasonable diligence, should discover, the facts essential to the malpractice claim." *Id.* at 494, 621 *A.*2d 459.

In *Cafferata, supra,* the Appellate Division stated:

The knowledge of the existence of the cause of action which will invoke the entire controversy doctrine is the same as the knowledge which will trigger the running of the statute of limitations in those cases to which the discovery rule of deferred accrual is applicable.

[251 *N.J.Super.* at 260, 597 *A.*2d 1101.]

Accordingly, as Judge Keefe acknowledged, because the discovery rule applies to a determination of when a legal malpractice claim accrues for statute of limitations purposes, the rule is equally applicable to imposition of the entire controversy bar. 274 *N.J.Super.* at 413–16, 644 *A.*2d 626. Thus, pursuant to the discovery rule, a professional malpractice claim accrues when: (1) the claimant suffers an injury or damages; and (2) the claimant knows or should know that its injury is attributable to the professional negligent advice. *Grunwald, supra,* 131 *N.J.* at 494, 621 *A.*2d 459; *see Mystic Isle, supra,* 142 *N.J.* at 326, 662 *A.*2d 523. The accrual of a cause of action occurs when a plaintiff knows or should know the facts underlying those elements, not necessarily when a plaintiff learns the legal consequences of those facts. *Grunwald, supra,* 131 *N.J.* at 493, 621 *A.*2d 459 (citing *Burd v. New Jersey Tel. Co.,* 76 *N.J.* 284, 291–92, 386 *A.*2d 1310 (1978)).

Plaintiff argues that it should not be barred from bringing its malpractice claim against GH & C and Petrics because at the time of the reformation litigation, its malpractice claim against defendants had not yet accrued. Plaintiff contends that because the extent of its damages were not set until after the reformation litigation was complete, its cause of action against defendants did not accrue until after the termination of that litigation. Additionally, plaintiff asserts that even if it was aware of the injury caused to it in 1988, it was not aware that either GH & C or Petrics was responsible for that injury, and that GH & C's continuing representation of plaintiff prevented plaintiff from discovering its professional malpractice claims. We reject both of these arguments.

As in all other instances where the discovery rule has been applied, injury and attributable fault are the key elements to satisfying the rule. *Grunwald, supra,* 131 *N.J.* at 495, 621 *A.*2d

459. In assessing the injury element, Judge Keefe recognized that a cause of action can accrue before the extent of actual damages are ascertained. "While actual injury to a client may exist in the form of an adverse judgment, such a judgment is not required in order for a cause of action to accrue." 274 *N.J.Super.* at 413, 644 *A.*2d 626 (citing *Grunwald, supra,* 131 *N.J.* at 495–96, 621 *A.*2d 459); *see also Busch, supra,* 264 *N.J.Super.* 385, 624 *A.*2d 1017 (cause of action challenging township engineer's recommendation accrued at time property owner brought action against township planning board, even though effect of engineer's tortious conduct could not be determined until after action against township was decided). In *Grunwald,* we recognized that a client may suffer injury in the form of legal fees before final judgment is reached. 131 *N.J.* at 495, 621 *A.*2d 459. Thus, "[l]egally-cognizable damages occur when a plaintiff detrimentally relies on the negligent advice of an attorney." *Ibid.*

In *Grunwald,* we recognized that "although an adverse judgment may increase a plaintiff's damages, it does not constitute an indispensable element to the accrual of a cause of action. *Id.* at 495–96, 621 *A.*2d 459. Moreover, while acknowledging that it was possible for damages to be extinguished or modified on appeal, we nonetheless held that such a result did "not alter the time when the underlying injury or harm occurs and becomes cognizable for purposes triggering the accrual of a cause of action." *Id.* at 496, 621 *A.*2d 459.

Thomas Pliskin of GH & C informed plaintiff that the Gaughran formula was incorrect in March 1988. Thus, at this time it is clear that plaintiff knew it had been injured because it had been overpaying rent according to a mistaken formula. In fact, plaintiff's complaint against Masward II in the reformation litigation mentions several times that the rent is based on an erroneous calculation. Thomas DeFelice's affidavit in support of plaintiff's motion for summary judgment states that the rent calculations were based on an erroneous calculation. His affidavit also admits that the overpayment of rent "was made simply because of the

mistake in calculation ... which we did not scrutinize and was mistakenly paid."

Plaintiff asserts that GH & C's continuing representation of Circle, up until January 1989, prevented Circle from discovering its professional malpractice claims. Moreover, Circle contends that Wasserman, who became Circle's legal counsel after GH & C's departure during the reformation litigation, failed to inform it of its possible claim against either GH & C or Petrics for the undetected mistake in the rent-increase formula. Wasserman, on the other hand, testified that he did notify plaintiff of the potential liability of both GH & C and Petrics, and that plaintiff responded that it did not intend to bring suit against either entity. Although the testimony regarding notification is indeterminate, the record demonstrates that plaintiff nevertheless had knowledge of the potential claim against both GH & C and Petrics even prior to plaintiff's initial January 26 meeting with Wasserman.

The record indicates that plaintiff knew in March 1988 that its rent overpayments were in part attributable to GH & C because the law firm admitted it was mistaken in the rent calculations. In his March 9, 1988 letter to Gaughran informing the firm of its mistaken calculation, Thomas Pliskin wrote, "All those persons involved with the determination of the rent, *including me,* have to the point of this letter been mistaken." (emphasis added). Plaintiff's brief submitted in support of summary judgment, in the settlement-reformation action, also states, *"All parties and attorneys* in the 1985 litigation mistakenly believed the calculations for the 'percentage' increase in the C.P.I. as stated by the attorney, Mr. Gaughran." (emphasis added). Therefore, plaintiff did have actual knowledge of GH & C's negligence as early as March 1988.

A malpractice action accrues when a party suffers damages and discovers or through reasonable diligence should discover, that the damage is attributable to a professional's negligent advice. Given GH & C's clear admission of error for the purposes of the reformation litigation (Petrics also testified during the litigation that it was mistaken), it is reasonable to hold Circle to construc-

tive knowledge of the malpractice claims. Reasonable diligence would have revealed to Circle the possibility of claims against GH & C and Petrics. Plaintiff's claim that GH & C's continuing representation prevented it from discovering a possible malpractice claim is misplaced. GH & C withdrew from representation in November 1988, almost two years prior to the termination of the reformation litigation. Thus, as determined by the Appellate Division, 274 *N.J.Super.* at 416, 644 *A.*2d 626, no genuine attorney-client conflict was present for the majority of the litigation.

The joinder requirements of the entire controversy doctrine would not have been negated, however, even if GH & C had maintained representation of Circle throughout the course of the litigation. A litigant must present all claims, even those against different parties, that stem from the same transactionally related facts in one controversy before one court. *DiTrolio, supra,* 142 *N.J.* at 272–273, 662 *A.*2d 494. The trial court must be given the opportunity to structure the litigation in the most efficient and most equitable manner available. Fragmented litigation and piecemeal adjudication are not a party prerogative.

### IV

Joinder of GH & C and Petrics also advances the goals of the entire controversy doctrine. First, joining them as parties would have encouraged a more comprehensive determination of the legal controversy—whether the mistaken calculations were a mutual mistake of fact, a mistake of law, or the result of negligent review by Circle's retained professionals. As the Appellate Division specifically found:

> GH & C's failure to advise Circle that GH & C and Petrics could be sued was an issue inextricably tied to the settlement reformation litigation and was, thus a part of that controversy; the controversy being who, if anyone, was responsible for Circle having to pay more rent than the lease required.
>
> [274 *N.J.Super.* at 418, 644 *A.*2d 626.]

Second, the interests of party fairness favor joinder of defendants in the underlying action. The defendants' ability to defend themselves has been prejudiced. Thomas DeFelice, the president

and sole shareholder of Circle, is now deceased. His claims cannot be subjected to cross-examination.[2]

Third, joinder fosters judicial economy and efficiency. Chief Justice Vanderbilt observed that "the fundamental object of the entire controversy doctrine is to prevent any single action from being nothing more than 'the trigger which * * * would start the chain reaction of other litigation to resolve the balance of the issues raised by the entire ·controversy.'" *Wm. Blanchard Co., supra,* 150 *N.J.Super.* at 294, 375 *A.*2d 675 (quoting *Vacca v. Stika,* 21 *N.J.* 471, 476, 122 *A.*2d 619 (1956)). Clearly, it would have been more efficient for Circle to have joined GH & C and Petrics in the 1988 litigation instead of commencing another lawsuit grounded in the same set of facts.

Lastly, we agree with the Appellate Division that "no reason exists why the [discovery] rule should not apply to [accounting-malpractice actions] as well," especially considering that numerous other jurisdictions already apply the discovery rule to such actions. 274 *N.J.Super.* at 414–15, 644 *A.*2d 626 (citing other jurisdictions applying discovery rule to accounting malpractice actions). Consequently, Circle's actions against Petrics accrued in March 1988, when Circle was first notified that the Gaughran calculations were wrong. In April 1985, Circle specifically asked Petrics to review the Gaughran formula. Petrics reviewed the formula and informed Circle that the calculations were correct. Clearly, Petrics' review was incorrect and constitutes a *prima facie* case of negligence.

## V

██ Plaintiff argues that it should be spared the preclusive effect of the entire controversy bar because the party-joinder component of the rule mandated by this Court's decision in

---

[2] His testimony is particularly relevant on the issue of knowledge because Wasserman testified in his deposition that he did advise DeFelice of malpractice claims against GH & C and Petrics.

*Cogdell, supra,* was decided on July 24, 1989, approximately 15 months after the reformation litigation was instituted. Plaintiff maintains that it was unaware at the time of the reformation litigation that the entire controversy doctrine applied to bar subsequent professional-malpractice claims, especially those involving attorneys involved in the underlying litigation.

This Court issued the *Cogdell* decision with the direction that it be applied "prospectively and to all cases not already on appeal." 116 *N.J.* at 28, 560 *A.*2d 1169; *cf. id.* at 28–29, 560 *A.*2d 1169 (Clifford, J., dissenting) (arguing that the interests of fairness require retrospective application of the decision). Lower courts have interpreted the phrase "all cases not already on appeal" to mean pending cases involving "the first lawsuit arising out of a common occurrence or transaction." *Reno Auto Sales, Inc. v. Prospect Park Sav. & Loan Ass'n,* 243 *N.J.Super.* 624, 627 n. 2, 630, 581 *A.*2d 109 (App.Div.1990).

Judge Keefe correctly recognized that the reformation litigation was the first lawsuit addressing the mistaken rent-increase calculation resulting in excess rents paid by Circle. 274 *N.J.Super.* at 412, 644 *A.*2d 626. Although the reformation litigation was initially filed before *Cogdell* was decided, the suit was not terminated until August 1990, one year later. Complaints, answers and other pleadings were filed after the *Cogdell* decision. Before and during this time the malpractice of the attorneys and the accountants had become implicated in the underlying litigation. As noted, the cause of action for malpractice against the attorneys and the accountants had accrued in March 1988. Thus, Circle was poised to consider initiating legal action against these defendants and should have been aware of the mandatory party-joinder rule and the consequences of failing to join all material parties while the litigation against Masward II was pending. Circle had more than sufficient opportunity to comply with the *Cogdell* mandate. *See Reno Auto Sales, supra,* 243 *N.J.Super.* at 630, 581 *A.*2d 109.

Moreover, the record itself indicates Circle's knowledge of the party-joinder rule. Circle's brief in support of summary judgment

is dated October 13, 1989. In particular, the pleadings of Masward II's suit against Thomas DeFelice in his individual capacity were filed in the fall of 1989. Masward II's complaint was filed on October 10, 1989 and the last responsive pleading, Thomas DeFelice's amended answer to the complaint, was received by the court on August 1, 1990. Notably, DeFelice's amended answer incorporated *Cogdell's* rule of mandatory party-joinder. The twenty-sixth separate defense states that the plaintiffs are barred from recovery for failure to include the "mandatory joinder of all parties in the within litigation."

Generally, an attorney's conduct in relation to the processing of claims is imputed to the client. *In re Matter of Roy*, 142 *N.J.Super.* 594, 599–601, 362 *A.2d* 589 (App.Div.), *certif. denied*, 71 *N.J.* 504, 366 *A.2d* 660 (1976). Thus, an attorney's failure to join a claim or a party in a legal proceeding usually bars the client from later bringing that claim.

Under *Rule* 4:50–1, however, a court may relieve a party from a final judgment for "mistake, inadvertence, surprise, or excusable neglect ... or [for] any other reason justifying relief from the operation of the judgment or order." *R.* 4:50–1(a), (f). The rule " 'is designed to reconcile the strong interests in finality of judgments and judicial efficiency with the equitable notion that courts should have authority to avoid an unjust result in any given case.' " *Baumann v. Marinaro*, 95 *N.J.* 380, 392, 471 *A.2d* 395 (1984) (quoting *Manning Eng'g, Inc. v. Hudson County Park Comm'n*, 74 *N.J.* 113, 120, 376 *A.2d* 1194 (1977)).

Excusable neglect is that carelessness "attributable to an honest mistake that is compatible with due diligence or reasonable jurisprudence." *Mancini v. EDS*, 132 *N.J.* 330, 335, 625 *A.2d* 484 (1993) (citation omitted). Only where a mistake of law is reasonable and there is some justification for a lack of determination of the correct law will the court grant equitable relief. *Demendoza v. New Jersey Transit Bus Operations, Inc.*, 194 *N.J.Super.* 607, 614, 477 *A.2d* 454 (Law Div.1984) (citing *Lutz v. Semcer*, 126 *N.J.Super.* 288, 294, 314 *A.2d* 86 (Law Div.1974). Mere ignorance

of the law, however, is not a sufficient basis to excuse compliance with the requirements of an established rule of law, especially when that ignorance is premised on the failure of the attorney to look up the relevant legal principle. *Lutz, supra,* 126 *N.J.Super.* at 297, 314 *A.*2d 86; *see DiTrolio,* 142 *N.J.* at 276, 662 *A.*2d 494.

Clearly, plaintiff has no justification for neglecting to ascertain that the entire controversy doctrine would bar a subsequent action against its attorneys and accountants for malpractice. Wasserman's testimony indicates Circle was notified of the potential professional malpractice claims during the pendency of the litigation. Wasserman also testified that he informed DeFelice that any malpractice action should be brought with the Masward II litigation. Whether plaintiff's decision not to bring the malpractice claims then was based on a desire to maintain the representation of Wasserman, who had indicated he would resign from the case should Circle choose to sue GH & C because of a conflict, or other personal or tactical considerations is of no significance. The fact remains that Circle failed to bring the malpractice action at the moment when the trial court was already involved in determining responsibility for the mistaken calculation, and now asks this Court to allow for a relitigation of that very issue with respect to a new defendant. Such clear disregard of our rules of joinder cannot be countenanced in the name of equity and fairness. There is "nothing in the circumstances of the case or considerations of fairness to justify depriving these defendants of the benefit of a rule that ... advances the goals of judicial economy and efficiency." *Cogdell, supra,* 116 *N.J.* at 28–29, 560 *A.*2d 1169 (Clifford, J., dissenting).

## VI

Plaintiff is barred by the entire controversy doctrine from bringing its malpractice claim against defendants. The judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice WILENTZ, and Justices HANDLER, POLLOCK, GARIBALDI, and COLEMAN—5.

*For reversal*—Justice STEIN—1.

STEIN, J., dissenting.

I agree with the Court's determination that attorney-malpractice claims are not exempted from the entire-controversy doctrine. However, because Circle Chevrolet Company (Circle) acted reasonably in choosing not to join as parties in the reformation action its former attorneys who had represented Circle in the underlying transaction, Giordano, Halleran & Ciesla (GH & C), principles of fairness dictate that the doctrine should not apply in this case.

## I

This Court has recognized that "justice is the polestar [of our judicial system] and our procedures must be moulded and applied with that in mind." *New Jersey Highway Auth. v. Renner*, 18 *N.J.* 485, 495, 114 *A.*2d 555 (1955); *see also Handelman v. Handelman*, 17 *N.J.* 1, 10, 109 *A.*2d 797 (1954) (stating that "rules of procedure were not designed to create an injustice and added complications"). Accordingly, we have consistently held that "the paramount policies of our law require * * * that the plaintiff be afforded an opportunity to have the claim adjudicated on the merits." *Crispin v. Volkswagenwerk, A.G.*, 96 *N.J.* 336, 338, 476 *A.*2d 250 (1984); *see also X–L Liquors, Inc. v. Taylor*, 17 *N.J.* 444, 454, 111 *A.*2d 753 (1955) (stating that dismissal pursuant to statute of limitations "would effectively defeat the plaintiff's action without any determination whatever on the ultimate merits—a result wholly inconsistent with the principles underlying our new judicial structure"). That overarching judicial policy is reflected by *Rule* 1:1–2, which provides that any Rule may be relaxed "if adherence to it would result in an injustice." *See also ADCO Assocs. v. Admiral Corp.*, 165 *N.J.Super.* 437, 440, 398 *A.*2d 584 (App.Div. 1979) ("[*Rule* 1:1–2] confers general power to relax any rule of practice if adherence to it would result in injustice.").

"The joinder requirements of the entire controversy doctrine are designed to achieve economy in litigation by avoiding the waste, inefficiency, delay and expense of piecemeal and fragmented litigation." *Cafferata v. Peyser,* 251 *N.J.Super.* 256, 261, 597 *A.*2d 1101 (App.Div.1991); *see Cogdell v. Hospital Ctr.,* 116 *N.J.* 7, 15, 560 *A.*2d 1169 (1989). However, in our application of that doctrine, we have "proceed[ed] on a step-by-step basis recognizing that the doctrine is one of judicial fairness and will be invoked in that spirit." *Crispin, supra,* 96 *N.J.* at 343, 476 *A.*2d 250. "[T]he doctrine must be invoked flexibly and sensibly." *Id.* at 352, 476 *A.*2d 250 (Handler, J., concurring); *see also Cogdell, supra,* 116 *N.J.* at 23, 560 *A.*2d 1169 (stating that "party fairness is critical in the application of the entire controversy doctrine"). In addition, "[i]t must be noted too that the limits of a policy favoring mandatory joinder of claims and nonparties with an interest in the controversy that is the subject of the litigation are reached when the joinder would result in significant unfairness." *Crispin, supra,* 96 *N.J.* at 354, 476 *A.*2d 250 (Handler, J., concurring). Because the entire-controversy doctrine is fundamentally predicated on a principle of fairness, we have been cautious not to "convert the entire controversy doctrine from an equitable device into a trap for the unsuspecting." *Cafferata, supra,* 251 *N.J.Super.* at 263, 597 *A.*2d 1101.

## II

Despite the commendable purposes of the entire-controversy doctrine, the unique factual circumstances present in this case suggest that strict adherence to the doctrine would be unfair. Given the state of the law in August 1990, when the reformation litigation was eventually tried, whether Circle's cause of action against its former attorneys had accrued was unclear. For Circle to have assumed at that time that any legal-malpractice claim it might have had against GH & C would not have accrued until either the case underlying the malpractice claim was disposed of on appellate review, or the time to appeal expired, would have

been entirely reasonable. An attorney who had surveyed the national case law in 1990 concerning legal-malpractice actions would have found that many jurisdictions subscribed to the view that the client was not injured, and therefore his or her claim against counsel did not accrue, until the plaintiff's underlying case was unfavorably disposed of on appeal. *See, e.g., Woodruff v. Tomlin,* 511 *F.*2d 1019, 1021 (6th Cir.1975); *Bowman v. Abramson,* 545 *F.Supp.* 227, 231 (E.D.Pa.1982); *Amfac Distribution Corp. v. Miller,* 138 *Ariz.* 152, 154, 673 *P.*2d 792, 794 (1983); *Haghayegh v. Clark,* 520 *So.*2d 58, 59 (Fla.Dist.Ct.App.1988); *Diaz v. Piquette,* 496 *So.*2d 239, 240 (Fla.Dist.Ct.App.1986), *review denied,* 506 *So.*2d 1042 (Fla.1987). That perception was subsequently confirmed by the Appellate Division in *Grunwald v. Bronkesh,* 254 *N.J.Super.* 530, 538, 604 *A.*2d 126 (1992) ("Postponing the accrual of a legal malpractice cause of action until appellate disposition of or the expiration of the time to appeal the case underlying the malpractice claim is consistent with decisions in many other jurisdictions.").

Application of the entire-controversy doctrine, "as in the case of all other preclusionary doctrines, * * * requires, as a matter of first principle, that the party whose claim is being sought to be barred must have had a fair and reasonable opportunity to have fully litigated that claim in the original action." *Cafferata, supra,* 251 *N.J.Super.* at 261, 597 *A.*2d 1101. A plaintiff is denied a fair and reasonable opportunity to litigate a claim when the entire-controversy doctrine is applied to bar that claim, especially when that claim arguably is not ripe for judicial review at the time that it theoretically should have been asserted.

Surely, Circle could not reasonably have forecast that this Court, thirteen months after the Appellate Division's decision in *Grunwald,* would reverse and determine instead that "the statute of limitations begins to run * * * when the client suffers actual damage and discovers * * * the facts essential to the malpractice claim,"—an injury that could accrue prior to the completion of the appellate process. *Grunwald v. Bronkesh,* 131 *N.J.* 483, 494, 621

A.2d 459 (1993). But even if Circle could have predicted the law as it was to be, whether Circle would have known that it had suffered actual damage attributable to GH & C's conduct until such time as it was inadequately compensated in the underlying litigation is another highly debatable issue.

"A legal-malpractice action derives from the tort of negligence. Therefore, a legal-malpractice action accrues when an attorney's breach of professional duty proximately causes a plaintiff's damages." *Grunwald, supra,* 131 *N.J.* at 492, 621 *A.*2d 459 (citation omitted). Because this Court has "conclude[d] that the discovery rule applies in legal-malpractice actions[,] the statute of limitations begins to run only when the client suffers actual damage and discovers, or through the use of reasonable diligence should discover, the facts essential to the malpractice claim." *Id.* at 494, 621 *A.*2d 459. Thus, an injured party's knowledge concerning the origin and existence of his or her injuries involves two elements: injury and fault. *Id.* at 492–93, 621 *A.*2d 459. Leaving aside the determination whether GH & C was at fault, whether Circle in fact was injured by GH & C at the time it brought the reformation action is less than clear. Rather, on this record, Circle was reasonable in not filing suit against GH & C based on the assumption that both the excessive rent payments and the attorney fees expended in the reformation action would be recovered in *that* action.

The reformation action was premised on a theory of mutual mistake, and Circle reasonably could have assumed that the reformation action would afford complete relief because the excessive rent payments could be entirely recovered in that suit. Indeed, the underlying matter was one that " 'presented a controversy [that] could * * * be resolved completely as to all concerned simply by' " resolution of the reformation action. *Ellison v. Schenck, Price, Smith & King,* 280 *N.J.Super.* 169, 176–77, 654 *A.*2d 1024 (App.Div.1995) (quoting *Vacca v. Stika,* 21 *N.J.* 471, 475, 122 *A.*2d 619 (1956)). Circle was reasonable in choosing not to join GH & C " 'in the prior action [because Circle] could have

secured complete relief \* \* \* without [GH & C].'" *Ellison, supra,* 280 *N.J.Super.* at 176, 654 *A.*2d 1024 (quoting *Cogdell, supra,* 116 *N.J.* at 13–14, 560 *A.*2d 1169).

Moreover, in respect of attorney's fees expended as a result of the reformation action, Circle's counsel stated during oral argument:

> [A]pparently, Circle was told by Mr. Wasserman that [its] legal fees will come back to [it] because what actions the \* \* \* defendant is asserting are all frivolous and there is a frivolous statute out there, so [it]'ll be made whole by way of recapturing their attorneys fees. In addition, this was a landlord-tenant dispute with a lease in place [that] had provision for attorneys fees. I can't say whether that particular aspect of it was disclosed, but the potential existed since we're in a landlord-tenant dispute, I can make application within the reformation suit to be made whole by not only the overpayment of rent but also my attorney's fees.

Accordingly, given the indeterminate state of the law prior to this Court's ruling in *Grunwald,* and Circle's justifiable belief that its damages as a result of its attorneys' failure to detect a rent-calculation error were fully compensable in the reformation action, to apply the entire-controversy doctrine and deny Circle its day in court to adjudicate the merits of its legal-malpractice claim cannot easily be justified.

As noted by the Court, the novel issue in this case "is whether the entire controversy doctrine applies to a malpractice action against an attorney who represents a client in the underlying transaction." *Ante* at 285, 662 *A.*2d at 511. Although this Court's decision to include attorney-malpractice claims in the scope of the entire-controversy doctrine was not entirely unforeseen, it was not preordained. In *Cogdell, supra,* this Court determined that the entire-controversy doctrine will apply to joinder of parties, but concluded that fairness to parties required that the doctrine be applied "only prospectively and to all cases not already on appeal." 116 *N.J.* at 28, 560 *A.*2d 1169. *Cogdell* was decided while this litigation was pending, over one year after the reformation litigation had been initiated and thirteen months before the case was to go to trial. Significantly, however, *Rule* 4:30A, codifying this Court's decision in *Cogdell,* was not effective until September 1990, after the reformation action already had gone to trial.

Nevertheless, the Court concludes that Circle had "more than sufficient opportunity to comply with the *Cogdell* mandate." *Ante* at 301, 662 *A.*2d at 519. Although an informed attorney should have been aware of the effect of the *Cogdell* decision, whether that decision required the application of the entire-controversy doctrine to bar related attorney-malpractice claims was far from settled. Indeed, that was not apparent until the Court's decision today. As in *Cogdell*, simple fairness dictates that the effect of the Court's ruling in this case not be applied to bar Circle's claim.

Furthermore, although not entitled to great weight, I cannot disregard the intangible factors that understandably make clients reluctant to sue their lawyers:

A lawyer is a friend in regard to the legal system. He is someone who enters into a personal relation with you—not an abstract relation as under the concept of justice. That means that like a friend he acts in your interest, not his own; or rather he adopts your interests as his own. I would call that the classic definition of friendship.

[Charles Fried, *The Lawyer as Friend: The Moral Foundations of the Lawyer–Client Relation*, 85 *Yale L.J.* 1060, 1071 (1976).]

That reluctance was particularly justifiable on this record because of the prospect that a successful resolution of the reformation action would have made it unnecessary for Circle to sue GH & C.

### III

Until today's decision I assumed "that the limits of a policy favoring mandatory joinder of claims and nonparties * * * are reached when the joinder would result in significant unfairness," *Crispin, supra,* 96 *N.J.* at 354, 476 *A.*2d 250 (Handler, J., concurring), and took for granted that the Court would not "convert the entire controversy doctrine from an equitable device into a trap for the unsuspecting." *Cafferata, supra,* 251 *N.J.Super.* at 263, 597 *A.*2d 1101. Although a new rule of law, the Court's holding that the entire-controversy doctrine applies to legal-malpractice claims was not unpredictable. But I cannot fathom what interest is served by applying that new holding to a litigant whose legal-malpractice claim had not clearly accrued, and who plausibly

anticipated a full recovery of its damages through a reformation action against its landlord. In my view, the Court has fallen short on its commitment that "party fairness is critical in the application of the entire controversy doctrine." *Cogdell, supra,* 116 *N.J.* at 23, 560 *A.*2d 1169.